## OLSEN v. NORTH PACIFIC LUMBER CO.

(Circuit Court, D. Oregon. January 16, 1901.)

1. VIEW BY JURY—MILL IN OPERATION.

In an action for injury to one employed in a sawmill as off-bearer at a saw, it is not error to permit a view by the jury of the place of the accident while the mill is being operated in the usual manner; the question being whether the saw carriage was started towards the saw before the hooks were removed from the cant, and the operation of the mill not contributing anything to the determination of these questions.

2. EMPLOYMENT IN MILL—STARTING OF SAW CARRIAGE—NOTICE.

There is no necessity of a signal being given to an off-bearer in a sawmill of the starting of the saw carriage, where it is uniformly started as soon as the hooks are removed from the cants, and the carriage has been so operated hundreds of times during the few days he has worked at it.

3. INJURY TO EMPLOYE—INSTRUCTIONS—HABITUAL NEGLIGENCE.

Instructions as to a fellow servant of plaintiff being an habitually careless man, given on return of the jury for further instructions, cannot be complained of on the ground that the word "habitually" had a tendency to impress the jury that there must have been a constant repetition of negligent acts to make the master liable for his negligence, where the allegation of the complaint was that he was habitually negligent, and the word was used in the same way in the general instructions without objection, and was constantly used during the trial by the attorneys on both sides to describe what was claimed to be his negligent character.

4. FELLOW SERVANTS—NEGLIGENT CHARACTER—NOTICE TO MASTER.
    A master cannot be charged with knowledge of the negligent character of a fellow servant of the injured employé by evidence that five years before the accident a person had been injured through his negligence, and that on three other occasions during the five years persons working with him had come near being injured.

E. B. Watson, E. Mendenhall, and John H. Mitchell, for plaintiff. Dolph, Mallory, Simon & Gearin, for defendant.

BELLINGER, District Judge. This is an action for damages for an injury alleged to have been the result of the negligence of the defendant company, through one of its employés, in its lumber mill in this city. The accident occurred on the 26th day of February, 1895. The plaintiff was employed in the defendant's mill in the capacity of off-bearer at what is called the "pony saw," operated by one Riley Rearick as sawyer. In this employment Rearick operated a steam derrick, by which cants, or logs sawed in convenient shape for that purpose, were lifted from the floor of the mill and put upon the saw carriage, where they were sawed into lumber. It was the off-bearer's business to detach the hooks attached to the derrick chain from the cants after they had been placed upon the carriage. On the occasion of the accident, the plaintiff being, as was claimed, in the act of performing this duty, Rearick, who was in charge of the pony saw, as stated, started the carriage forward while the plaintiff's right foot was upon it, so that his foot was carried forward against what is called a live roller, near the bed of the carriage, and caught and forced between such roller and a projecting head block on the carriage bed, and thereby mangled so that amputation became necessary. The plaintiff attributes the accident to the negligence of Rearick in starting the carriage forward without giving any signal or warning to the plaintiff that he was about to do so. It is alleged that Rearick was habitually careless and negligent in the performance of his duty as sawyer, of which negligent character the defendant knew, or ought to have known, and that the defendant is furthermore guilty of negligence in not giving proper instructions and providing suitable rules and regulations for the conduct of Rearick in the discharge of his duty, and for not exercising reasonable diligence and care in inquiring into and supervising and controlling his conduct as such sawyer in its employment. The case was tried before a jury, and a verdict returned for the defendant, whereupon plaintiff files a motion for a new trial upon the grounds hereinafter stated.

The first ground of the motion for a new trial is the order of the court permitting a view by the jury of the place where the accident occurred, while the mill was being operated in the usual manner. It is claimed that this view while the mill was in operation enabled the jury to form conclusions as to whether it was reasonably necessary for the head sawyer to look out for the plaintiff, or to give him notice or warning before starting the carriage, or whether the removal of the hooks from the cants was the signal for the sawyer to start the carriage, etc. It is argued that the jury cannot disre-

gard what they have seen with their own eyes upon the view by the permission of the court, that the view was simply for the purpose of enabling them to understand and apply the testimony, and that they are not allowed to come into possession of facts during such view which are liable to influence the conclusions reached by them in the case. A number of cases are cited in support of the contention made by the plaintiff. It has been held error to permit the jury to view the premises where a collision occurred between a delivery wagon and a locomotive on a railroad track, and to observe from different points the running of an engine over the track while sitting in a wagon of the same height as that driven by the plaintiff. In another case, for damages to a dwelling house from the alleged negligent operation of an electric plant, the sheriff in charge of the jury during the view directed the employé of the defendant in charge of the works to put on steam with certain force, so as to give to the jury a practical exhibition of the operation of the works, and this was done. On appeal the judgment was reversed, the appellate court saying:

"The exhibition of the manner of conducting this plant suggested by the sheriff, while the jury were viewing the premises, was in the nature of evidence submitted to them in the absence of appellant and her counsel, and might have been highly prejudicial, as it was possible for the employés of appellee, at this suggestion of the sheriff, to have given only a modified exhibition of the manner of operating the plant, and thus to have improperly influenced them."

These cases, and the principle upon which they are decided, are not applicable to the case on trial. They are cases against experiments conducted in the presence of the jury for the purpose of illustrating facts decisive of, or having important bearing upon, the cases on trial. In this case there was nothing in the nature of an experiment, nor did the operation of the mill in its usual way have that effect. The mill was operated, so far as appears, as it is ordinarily operated, except for the fact that Riley Rearick, whose negligence it is alleged was the cause of the plaintiff's injury, was not in charge of the operation of the saw at the time of the view. In the case last referred to the sheriff ordered the operator to put on steam with certain force, for the purpose of giving a practical exhibition of the operation of the works; and, moreover, neither the plaintiff nor her counsel was present,—a fact to which the court gives importance in its opinion. Moreover, the charge of negligence in this case is in no way related to the manner in which the mill was being operated. It is simply a question of notice; the negligence being in the alleged fact that it was the duty of the head sawyer to give notice before starting the saw carriage, and that in failing to give this notice he was negligent, and, being habitually a careless man, the company is responsible for this negligence, and is furthermore responsible in having failed to promulgate rules and regulations to govern the conduct of said Rearick in the discharge of his duty, and in failing to inquire into and to supervise and control his conduct. The testimony as to Rearick's negligence causing the injury is that of the

plaintiff, which is summarized by his attorney, in his bill of exceptions on a former trial, as follows:

"That on the 25th day of February, 1895, he (Olsen) went to work as second off-bearer at pony saw,—Rearick, sawyer,—by Handler's directions. That part of the afternoon of the 25th, worked as head off-bearer at pony saw. That on morning of February 26th. about 9 a. m., a large cant, 32 feet long, 16 inches thick, and 3½ feet wide, was to be taken from the floor and placed on the pony carriage. Olsen, as second off-bearer, put hooks upon the cant, and it was lifted by the derrick: Rearick, sawyer, in charge of derrick. Head off-bearer and Olsen pushed cant around to its place. That it required to be turned, but he (Olsen) did not understand the signals made by the sawyer, and the head off-bearer explained what was needed. The cant was turned and placed on the carriage. That the hooks were tight in the timber, and he (Olsen) was obliged to place his foot on the edge of the carriage to get purchase so that he could pull down derrick chain so as to loose the hooks. 'That was the only place that I could have stood.' That while he was standing with one foot on the side of the pony carriage, and the other off the floor to balance his body, the sawyer, Rearick, started the carriage forward, and his foot, which was on the edge of the carriage, was caught between the projecting end of the head block and the live roller and was crushed."

The fact that the jury saw the mill in operation could not affect the question of negligence alleged in the complaint, or the acts of negligence testified to by the plaintiff. If any view serves to illustrate how the accident happened, the fact of the machinery being in operation would only be an additional aid in that result. The mill in operation contributes nothing to the question of notice by Rearick that the carriage was about to start, nor to the question whether on this particular occasion the hooks were removed from the cant before the carriage started. If the carriage was started before the hooks were removed, then Rearick was guilty of negligence. The answer admits that it was his duty not to start the carriage until the hooks were clear of the cant. Did he do so? And, if not, was the carriage started while the plaintiff appeared to be in a position of danger, and generally did Rearick exercise reasonable care for plaintiff's safety in starting the carriage? These are vital questions of fact in the case, and the operation of the mill does not contribute anything to the determination of these questions, or any of them. The jury can no more form an idea in respect to them with the mill in operation than without it, and so the minds of the jury could not in any way have been influenced in the decision of the question of negligence by what they saw in the operation of the mill. The same is true as to any question there may be of plaintiff's own negligence. Unless the conditions as they existed at the time of the accident are reproduced, the mere operation of the mill would make no difference. It is not claimed that any attempt was made to reproduce the conditions of the accident. The plaintiff's testimony shows that these were special, if not exceptional. The cant handled at the time of the accident was 16 inches by 3½ feet in width, and about 32 feet long, with a slope on one of its edges. I quote from the plaintiff's testimony on the former trial, that given on the last trial not having been transcribed:

"This sloping edge is like here. [Indicating.] This is about the shape of the hooks, too,—kind of rounding shape: and it hooks in at this square side, and lays along the beveled edge, rounding; and on the other side it comes

in here and hooks on this upper corner, and goes in towards this wood quite a ways. To the best of my judgment, I could not get it off by the usual way, doing it with small cants, as we did by these four-inch cants. And I put my foot up on the carriage bed, because the edge of the blocks project above the carriage bed about six inches, and outwards, so it projects over the rollers about half an inch or so. That is my recollection, as I have seen it. I stepped up here, and on this carriage bed, without thinking, of course, that there was any danger. I got my hand up on the chain about two feet, and was going to pull this slack, and use the other one on the far-off hook; that is, this hook on this side. We will say this is the way the setter is sitting, and this is the back of the head blocks. This is where the saw will be. This side, the nearest hook, as I say, would come off the quickest, and I was going to grab that and get it off, and the whole thing would be loose from the cant; and as I was in that position, pulling on the chain, to get hold of that hook, Mr. Rearick started the carriage, and I was caught between the head blocks and the live rollers."

The plaintiff says that he "could not get it off" (the hooks off) "by the usual way," as with small cants, "and" he put his foot up on the carriage bed. The question whether this was negligence on his part—and there is nothing else to which negligence can be imputed—depends upon the reasonableness of his conduct in departing from the "usual method," and this depends upon the special conditions as described by the witness. If it appeared that these conditions, which were out of the usual way. had been reproduced at the time of the view, the objection now made would have force; but that does not appear, and there can be no presumptions of fact against a verdict.

There was some testimony to the effect that Rearick was in the habit of starting the derrick machinery with a jerk, so that the hooks would be torn loose from the cants, causing them to fall or turn over; and it was contended that it was practicable to start the derrick machinery slowly, by gradually bringing the two mechanisms in contact, —that of the mill in operation and that of the derrick,—as will be explained hereafter. This testimony, it will be seen, has no reference to the accident in question, but relates to the alleged negligent habits of Rearick. A view of the mill in operation would throw no light on this contention unless the derrick machinery was in fact operated slowly, and this would not be to the prejudice of the plaintiff, but the reverse. What is said of this testimony in considering the third ground of plaintiff's motion makes it clear, if there was doubt otherwise, that the operation of the mill could have afforded the jury no information as to the matter to which the testimony relates. The circuit court of appeals, in reviewing this question on an appeal from a judgment on a former trial of this case (100 Fed. 388), says:

"We are not prepared to say that a view of a scene of an occurrence may not include machinery in operation. To permit the operation of the machinery, however, by the persons whose care or skill or duty is in question, is seriously disputable."

In a case like this I am of the opinion that it is wholly immaterial, for the reasons already suggested, whether the person whose negligence is alleged to have occasioned the injury operates the mill at the time of the view or not. Nevertheless, out of deference to the suggestion made in this opinion, Rearick was not permitted to oper-

ate the pony saw in question while the view took place. Under no circumstances should I feel warranted, upon a second trial, in departing from the course pursued in the former trial, where that course had been a ground of objection on appeal, and in respect to which this court, if not sustained, had at least not been overruled nor criticised.

The second ground upon which the motion for a new trial is based is the refusal by the court to give plaintiff's instructions as to the question of notice by Rearick to the plaintiff that the carriage was about to start, and the giving by the court of the following instruction:

"Something has been said as to the duty of the company to provide rules and regulations. There is no testimony proper for your consideration tending to show that in this particular case there was any duty devolved upon the mill company to provide rules and regulations as to how that saw should be started. The question of negligence in starting this saw, broadly, is submitted to you for your judgment as reasonable men. It is claimed that the nature of that employment is such that the employés were bound to take notice that when the cant was upon the carriage and the hooks were loosened the carriage was to start, and that the employés had notice of that from the manner in which the mill was being operated; that the mill was operated continuously in that way, from month to month and from year to year, and for at least two or three days' time during which this plaintiff operated there as second off-bearer: that he knew and saw that that was the way the mill was operated,—when the cant was on the carriage and the hooks were loosened the carriage started. There is nothing that justifies the claim that the mill company ought to have had rules; that they ought to have had some bell or signal, or method of notifying the party that the carriage was going to start. Independently of the practice and of what was reasonable,—what a reasonably prudent man would have supposed, and what the course of business warranted him in knowing, was the way in which the mill was operated. The duty was enjoined upon Riley Rearick, not by rules,—that makes no difference,—but the duty was enjoined upon him by law, to be careful. The mill company could not have made that duty any stronger than the law makes it. The law devolves upon him the duty to exercise reasonable care in his conduct in the operation of that saw, and what is reasonable care is a question for your determination. The law also enjoined upon the plaintiff himself the exercise of reasonable care. He was not to trust wholly to Riley Rearick. He must look out for himself. It was a hazardous employment he engaged upon, and he must exercise reasonable care himself, and the law enjoined that duty upon him. The law enjoined upon each of these parties the duty to be careful in their respective employments; each to look out for himself, and each to look out for his co-employés as far as circumstances would permit,—as far as it could be reasonably expected of them under the circumstances; and, if the company had enjoined that duty by rules, it would have made the duty no more obligatory than the law makes it. It would not have strengthened the obligation which the law imposed upon these parties in that respect. So, then, gentlemen, if Riley Rearick was a careless man, and if the company knew that he was a careless man, either from general reputation or from notice of specific acts of carelessness coming to it, and if, being so careless, Riley Rearick was careless at the time of this accident, and the plaintiff himself was not careless at the time of the accident,—was in the exercise of due care,—if you find all these things concurring, then you may find a verdict for the plaintiff, and it will be your duty to do so. Otherwise, your verdict should be for the defendant."

This instruction was given upon the former trial, and was made one of the grounds of exception upon which the appeal to the circuit court of appeals was based. The court further instructed the jury on this trial that there is nothing in the case tending to show that it was Rearick's duty to give particular notice that the carriage was about

to start. What was required of him was to exercise due care in starting the carriage, for the safety of his fellow employés, and to see that the hooks were free from the cant, and not to start the carriage if any of his fellow servants appeared to be in a position of danger. These instructions fully state the duty of Rearick in this behalf. As held on the former trial, there is nothing in the case to warrant the contention that the company ought to have provided rules and regulations prescribing a duty that the law devolved upon Rearick; nor was there anything in the case requiring any particular notice that the carriage was about to start. The question was fully covered, in my opinion, by the decision of the circuit court of appeals. In its opinion the court says:

"The contention that the defendant should have directed Rearick as sawyer, by rules and regulations, to observe care to the plaintiff as off-bearer, cannot be sustained. To observe such care was essentially Rearick's duty, assumed in and by his employment. The business was not complex. There was no evidence that it was customary in sawmills to direct employés by special rules, and it could not be so held as a matter of law, or submitted to the jury to decide without evidence."

The ordinary method in which the work was carried on, and that necessarily employed in work of this kind, was all the notice that the plaintiff was entitled to, or that was practicable under the circumstances. The character of the work advised the plaintiff that as soon as the hooks were removed from the cant the carriage would start. It is true, he had worked in this position a very short space of time; but in that time the operation of placing cants upon the carriage, and of moving the carriage to the saw thereafter, had been performed many hundreds of times. No notice could have better advised him of the fact that the carriage would start as soon as the hooks were removed than his own experience hundreds of times repeated.

The next and third ground of the motion is the giving by the court of the following instruction:

"You have heard the testimony of the defendants with reference to the way this chain operates. The chain revolves on a spool,—so the defendants say,— and that spool is only four inches in diameter. They say that it is not operated by independent machinery, but is operated by the mill machinery, which is going all the time, and that this machinery (this spool or machinery that operates the cant hooks) is started by bringing in contact the two frictions,— the friction of the mill machinery and that of the derrick machinery. Now, it seems to me that this is a matter about which there ought to be no question. It involves a principle in mechanics that ought to be easily determined, and as to which there has been no conflict in the testimony. The witnesses for the defendant say these hooks are started just so rapidly, neither faster nor slower, and that there is no jerking of the lever that will affect their motion; that the machinery is going constantly at a regular rate of speed, and when these two frictions are brought together the hooks start. If so, then it seems to me that this testimony which charges Rearick with negligence in starting the hooks so rapidly is not entitled to much consideration. However, that is a question, gentlemen, for you, as all questions of fact are in this case. You yourselves must determine what the testimony is, and must determine the effect to be given to that testimony."

The instruction did not undertake to prejudge the question to which it refers, and it does not purport to do so, and was not so understood by plaintiff's attorneys at the time. It does not undertake to

do more than state what the contention is, and to state what the defendant's claims are with respect to the particular matter. After stating these contentions, the court says:

"If so, then it seems to me that this testimony which charges Rearick with negligence in starting the hooks so rapidly is not entitled to much consideration. However, that is a question, gentlemen, for you," etc.

At the conclusion of the instructions the following colloquy took place between the court and plaintiff's attorneys, which is sufficient to remove all doubts as to what was intended, or understood by the jury, if there could possibly be any doubt from the language of the instruction itself:

"Judge Watson: With reference to the sudden starting of the derrick,— that the evidence was to the effect that by these two frictions it could be started slow or fast, but it would make the shaft hot. It would run for a minute or so: We do not think that the evidence tended to show that Rearick could not start it slow or put it on full if he wished to. We think that was within his power. But the explanation was, as I understand it, that it could not be done fast, because if it were it would set the shaft on fire, or heat it, if it ran for a minute, or something of that kind. So I think it would be in his power to do it. Mr. Mallory: He said he could not do it because the result would be to set the mill on fire. Judge Watson: He had physical power to do it. Court: I have in that respect merely undertaken to explain to you the contention that is made in that behalf. I will leave it to your determination what the fact is,—as to whether it could be started in that way, and as to whether it in fact was, and as to whether these several acts were acts of negligence on Rearick's part."

But, aside from this, I am convinced that it would have been entirely proper for the court to instruct the jury to disregard the testimony with reference to the sudden jerking of the hooks attached to the derrick lever. It is beyond question, from the uncontradicted testimony in the case and from the knowledge which is derived from common observation, that the two frictions in question could be brought together only in one way; that they could not be gradually brought together so as to produce any other effect than that which causes the machinery to start at once upon the movement of the lever operating the derrick mechanism. In other words, there could be no friction between these two parts that would not involve the generation of such heat as would at once set them on fire.

The fourth and last ground of the motion for a new trial is based upon what took place upon the return of the jury to the court room for further instructions. This proceeding, as shown by the reporter's notes, is as follows:

"The jury then went out to deliberate as to their verdict, and in the afternoon came in for further instructions. Mr. Clark: We should like some instructions as to the liability of the defendant, in so far as Mr. Rearick being a habitually incompetent or a careless man, we are unable to agree on that particular subject. Court: Do you want to know what the responsibility of the defendant is, provided Rearick is a careless man? Mr. Clark: Yes, your honor. Court: Providing the jury should find he was a careless man,— habitually careless? Mr. Clark: Yes, sir. Court: And provided you should find that this accident was the result of his negligence? Mr. Clark: Yes, sir. Court: If you find, first, that this accident is the result of his negligence; second, if you find that he is a habitually careless man; third, if you find that the defendant knew that he was a habitually careless man, or ought to have

known it under the circumstances,—these three things concurring, then your verdict should be for the plaintiff. Otherwise, it should be for the defendant. Is that satisfactory? Does that answer the question? Mr. Clark: I think so."

It is argued with very great earnestness that the court ought not to have used the word "habitually" in describing the carelessness of Rearick which would suffice to make the company liable; that the words "habitual" and "habitually" had a tendency to convey to the minds of the jury the idea that there must be a constant repetition of negligent acts on the part of Rearick in order to make a case against the defendant. This word was used in this instruction to the jury precisely as it was used in the general instructions given in the presence of plaintiff and his attorneys without objection or criticism on their part. That word had been constantly used during the trial by the attorneys on both sides to describe what was claimed to be Rearick's negligent character. It was used by the court in the principal instructions, and in this particular instruction, in the sense in which it had been used and understood throughout the trial,—to distinguish the negligence complained of from a single act of negligence, or from what may be termed the "casual" negligence of Rearick,—and must have been so understood by the jury. The allegation of the complaint is that:

"Rearick was at and during all said times unskillful in and incompetent for the duties and requirements of his said employment, and was habitually careless and negligent in the performance thereof, and defendant then and there and during all said times had full notice and knowledge of the same."

It was in this sense that the court used the word "habitually,"—the sense in which it is used in the complaint, and in which it was used in the instructions given in the presence of the plaintiff and his attorneys, in which the court said:

"The ground of recovery in this case is that the defendant corporation itself was negligent, and this negligence it is sought to make out by proving that Riley Rearick was habitually negligent, and, being so habitually negligent, was negligent on this occasion, and that his negligence on this occasion caused this injury, and that the defendant company had notice of his negligent character, his negligent habits, and that is what is necessary to charge the defendant."

If the plaintiff's attorneys supposed that this use of the word "habitually" in the instruction would mislead the jury, they should have called attention to the fact at the time, thus giving the court an opportunity to relieve the minds of the jury of any such impression as it is now argued they may have derived from the use that was made of this word; and the court would have been put upon its guard when it came to answering the specific question put by the jury on their return to the court room. Instead of this, however, attorneys for the plaintiff, in effect, approved the instructions, although excepting to them in order to "save the point," as will appear from what took place at the conclusion of the instructions to the jury:

"Mr. Mitchell: Do we take exceptions after the jury retires? Court: The circuit court of appeals requires them to be taken while the jury is here. I suppose you want exceptions to those instructions which you requested that I have not given? Judge Watson: And to each one of those that were given. I think they are substantially correct, but we would like to save the point."

But it is impossible that there could have been any such misapprehension as is suggested, under the circumstances of the case. In the principal instructions given, the jury were told that there was evidence proper for their consideration as tending to show that Rearick was a negligent man; and that evidence was pointed out to the jury, and briefly recapitulated, accompanied by this statement in conclusion:

"These are the several incidents and accidents, if you may term them such, relied upon by the plaintiff as showing that Rearick was habitually careless and negligent."

So that if this testimony proved anything, under the instructions given, it proved a negligent habit on the part of Rearick; and, if it was not sufficient to prove that, it was not sufficient to prove anything material in the case.

But, independently of all these considerations, the motion for a new trial must be denied upon the further ground that there was not evidence in the case sufficient to sustain a verdict. Assuming that there was evidence sufficient to go to the jury upon the question of Rearick's negligence at the time of the accident, and assuming that there was sufficient evidence to establish a negligent character or habit for Rearick, as contended for by the plaintiff, yet the evidence to charge the defendant with knowledge of this negligent character was wholly insufficient. The evidence of negligent acts was confined to four instances, only one of which resulted seriously. That occurred in 1890, more than five years before the accident in question occurred. The circumstances as detailed do not make it clear that Rearick was negligent on that occasion. The injured party, a man named Thompson, whose leg was broken by the accident, gave this account of how it occurred:

"He [Rearick] laid the cant down on the roller and gave me a sign to unhook the hooks, and he turned the lever of the pony carriage. At the same time I unhooked the hooks he turned the lever, and one of the cants turned over on the pony carriage, and the other cant came down on me. He did not give me a show to get out of the road there."

It seems that there was a pile of lumber behind Thompson, which prevented him from getting out of the way of the cant when it accidentally turned over on the carriage. Whether this was a negligent act on the part of Rearick or not is wholly immaterial. It was the only accident, so far as the testimony goes, of which the company had notice; and in fact it was the only accident testified to on the trial. None of the other so-called accidents were of such a character as would justify a presumption of knowledge on the part of the company. One of them was a case where the witness claimed that Rearick had not given him time to put the hooks properly on the cant, with the result that the cant turned over toward him, and he (the witness) jumped on top of it. It nearly caught his legs. That was all there was of this alleged accident. Another case was that of an employé who was about to step on the carriage, when Rearick started the carriage, and his foot came down behind the carriage, instead of on it, into a hole in the mill floor, without injury; the hole being a shallow one, as appears. In another case the hooks were jerked

loose from the cant, so it was claimed, and caught in and tore one of the employés' breeches. None of these occurrences, if they deserve to be called accidents, would likely be talked about where the company would hear of them; and there is no evidence that the company did hear of them. But these so-called accidents, excepting in the case of Thompson, were not accidents at all, in any proper sense of the word. In view of the character of the work and of the time under consideration, it would have been, in my opinion, a very great injustice to Rearick to have concluded from these happenings that he was a careless man. To have discharged him on such grounds would not have been the act of a reasonable employer, but it would have been an unreasonable act, without common sense and justice. There is the testimony of one other witness that was offered to prove that Rearick had the reputation of a careless man. That witness is B. Versteeg. He appeared for the first time on the last trial. His father at one time was a member of the defendant company, and through this interest the witness was a director in the company about the time that plaintiff was injured. He has a grievance growing out of business troubles with the defendant. He testifies, in effect, that along during the years 1894 and 1895 Rearick had the reputation of being a careless man, and that this reputation grew out of the fact that there had been men injured at the mill; that there had been others injured besides Thompson; that it was reported that there had been different parties hurt on account of Rearick. The witness, on cross-examination, admitted that he did not mention this bad repute of Rearick to any of his associates in the defendant's board of directors. The testimony of the various employés in defendant's mill who testified for plaintiff covered very fully a period of five years preceding the first trial of this cause in the state court in October, 1895. And, as already stated, this testimony does not show that any one was hurt, with the exception of Thompson, during that period. Thompson himself worked there two and a half or three years. It is very clear that the reported injuries to different persons upon which Versteeg bases a bad reputation for Rearick were without foundation. There could be no reputation for careless habits upon such a basis. What this witness heard, if he heard anything of accidents aside from that to Thompson, must have been some gossip about Harrison having stumbled and stepped behind the saw carriage into a hole in the mill floor, or of Carlsen having jumped on top of a cant when it accidentally rolled over, and of probably one other not dissimilar occurrence, or of the accident to Wilson, by which his breeches were torn. There was nothing more, so far as appears; and, if there had been anything more, these witnesses—one or more of them—must have known of it. This kind of reputation could not be notice of anything to the discredit of Rearick as a careful man. It is well settled that the mere fact that there has been some evidence to go to the jury does not necessarily imply that the verdict should not be disturbed. The court will not decide upon the weight of evidence, but it will not allow a verdict to stand upon no evidence or upon slight evidence. In this case the evidence in the particulars mentioned was so slight and unsatisfactory that it would

have been the duty of the court to set aside the verdict, if there had been one. A verdict upon which a judgment is based that determines the rights of parties must have a substantial support in the evidence in the case. And, while this question is not formally presented, yet it is a matter proper to be considered upon a motion for a new trial, whether, after all, there is enough in the plaintiff's case, upon his view of the law, to warrant a trial. The motion is denied.